# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANNE MARIE FANDEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NO. 11-CV-89 |
| v. ) | |
| ) | District Judge Robert M. Dow, Jr. |
| FROST LIGHTING COMPANY OF ILLINOIS, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anne Marie Fandel ("Plaintiff") claims that she was discharged because she became pregnant. She brings claims against her former employer, Defendant Frost Lighting Company of Illinois ("Frost"), for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, and the Illinois Human Rights Act. Defendant has moved for summary judgment [75]. For the following reasons, the Court denies Defendant's motion for summary judgment [75]. However, the Court dismisses Counts II and IV as superfluous in light of Count I.

**I.    Facts**[1]

Defendant Frost Lighting Company of Illinois, Inc. ("Frost Lighting") is in the business of providing lighting, staging, audio, video, and fabric design services for special events. Frost Lighting's president is David Kelly. From May of 2000, to July of 2009, Frost employed Yasmeen Shorish. While employed by Frost Lighting, Shorish's primary responsibilities were to

---

[1] The Court takes the relevant facts from the parties' respective Local Rule 56.1 ("L.R. 56.1") statements, to the extent those facts are supported by admissible evidence. The Court resolves all genuine factual ambiguities in Plaintiff's favor (see *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004)), and takes no position on whose version of disputed factual matters is correct. See, *e.g.*, *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (stressing that on summary judgment, courts must look "at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true").

provide production support to Brian McGinley (Frost Lighting's operations manager) and produce drawings and renderings with computer-aided design ("CAD") software for Frost Lighting's clients and prospective clients. Shorish provided production support by helping McGinley coordinate equipment rentals for events, making purchases, helping to identify conflicts and shortages of gear for events, and supplementing inventory when there were conflicts or shortages of gear. The CAD drawings and renderings produced by Shorish were used by Frost's sales team to sell Frost Lighting's vision for special events to clients and prospective clients. The parties dispute whether Shorish provided only two-dimensional drawings or also provided 3D renderings. In June 2009, Shorish notified David Kelly that she would be leaving Frost in order to move closer to her family.

Shorish recommended Anne Marie Fandel to replace her. Based on Shorish's recommendation, Kelly interviewed Fandel. During her interview, Fandel stressed her ability to provide production support and stated that she could handle a lot of pressure, was good at thinking on her feet, was used to a lot of volume, and excelled in high energy work environments. She also represented that she knew how to use the CAD programs Vectorworks and AutoCAD. Following the interview, Kelly hired Fandel at an annual salary of $40,000. Fandel worked for Frost for approximately three and a half months, from July 20, 2009, to November 6, 2009.

At this point, the parties' stories diverge. According to Defendant, Fandel was hired to provide production support to McGinley and produce CAD drawings and renderings for Frost's clients and prospective clients. The parties dispute whether Fandel was expected to provide only two-dimensional drawings or also provided 3D renderings. Kelly expected Fandel to split her time equally between production support and producing drawings or renderings. Kelly maintains

that Fandel showed little initiative in providing production support to McGinley and instead spent most of her time working on CAD drafting. As a result, in the fall of 2009, Aaron Burger, another employee of Frost, began providing production support to McGinley in the same manner provided by Shorish before she resigned. Frost maintains that, despite working primarily on CAD drafting, Fandel could not produce drawings fast enough to meet Frost's needs and also could not produce 3D renderings.[2]

In Fandel's version of events, Fandel stated that she could prepare two dimensional floor plans but not 3D renderings. She also stated that she would be willing to learn if Frost would send her for training. According to Fandel, Kelly told her that 3D rendering experience was unnecessary and that Frost could hire others to perform that task if need be. Fandel also disputes that she was hired to provide production support to McGinley. Rather, she maintains that her supervisor was Kelly and that she was never told to report to McGinley. She claims that Frost hired her to be a "production assistant and drafter," not a renderer. According to Fandel, Frost never asked her to prepare a 3D rendering for an event. Instead, she prepared dozens of two dimensional floor plans for Kelly and Frost sales executives. Kelly permitted her to send floor plans directly to clients. Fandel maintains that no employees or clients ever complained to her or the general manager about her performance at Frost.

In August 2009, Kelly was in the process of hiring a general manager to handle Frost's operations. He ultimately hired Michael Schiml, who began working as the general manager on August 31, 2009. On August 30, 3009, Kelly sent Schiml an e-mail with an outline of Frost's operations and descriptions of the employees. Kelly described Fandel as follows:

---

[2] Frost maintains that other employees complained to Kelly about Fandel's performance; however, Defendant's support for these assertions is hearsay and also runs afoul of Magistrate Judge Valdez's order of January 3, 2012, which concludes that no Frost employees are allowed to testify except Kelly, Hubbard, and Michael Schiml.

3

> Anne Marie Fandel – Drafting, general assist to Brian. Anne Marie took Yasmeen's position, she has really just primarily been working on drafting, she did not have a great deal of experience when she started and is improving, however there are some concerns as to how well she is working out and if we shouldn't be looking for someone with far stronger drafting and rendering skills.

Kelly maintains that he believed Fandel should be fired in September 2009. He further maintains that he convened a meeting with various members of Frost's sales and production team to discuss Fandel's performance and decide how to proceed. Although several employees allegedly attended this meeting, Defendant has cited only David Kelly's deposition testimony and affidavit in support of its assertion. Furthermore, Frost admits that it did not have formal procedures in place to document any alleged complaints about Fandel's performance, that it does not have any "documented" complaints, and that it has no evidence of any complaints other than David Kelly's testimony and affidavit.

In late September to early October 2009, Kelly ran into Jessica Yen while working on a project. At the time, Yen was working for a company called Ronsely Special Events, a client of Frost, as its creative director. In that position, Yen produced renderings and floor plans for Ronsley. After learning that she was not happy with her current position, Kelly asked if she would be interested in working at Frost and the two set up a meeting. Kelly described the meeting as an interview, while Yen testified that it did not "feel" like an interview to her. In mid-October 2009, Yen met with Kelly at Frost's offices and, following the meeting, sent Kelly a copy of her resume. During the meeting, Kelly informed her that "someone that he had was not living up to, you know, what he thought they could do," and that maybe she could fill that person's shoes. Yen informed Kelly that she was currently making an annual salary of $80,000. Yen did not have experience with Vectorworks, which Kelly believed to be an essential part of Fandel's job. Frost alleges that it did not hire Yen because it could not afford to pay her a salary

that was double what it was paying Fandel and Kelly was concerned about making a client unhappy by hiring one of its employees.

Shortly after meeting with Yen, Kelly received a resume from Elizabeth Hubbard. Hubbard had mailed copies of her resume to approximately seven companies. On October 24, 2009, Kelly sent an e-mail to Hubbard asking her to interview with Frost; Hubbard responded by telephone and scheduled an interview. In his e-mail to Hubbard, Kelly stated that Frost had "been trying to add the ability to do visual renderings to our in-house capabilities."

On October 26, 2012, Fandel informed Kelly and his wife, Lisa Kelly, that she was pregnant. According to Fandel, Lisa Kelly congratulated her and said "we will talk later about family medical leave." Fandel maintains that Kelly did not congratulate her, acted annoyed, and questioned Fandel about taking medical leave and for how long.

On or about October 28, 2012, two days after Fandel announced her pregnancy, Kelly interviewed Hubbard for the position of "design assistant."[3] Hubbard met with Kelly in Frost's conference room for about an hour and showed Kelly her portfolio of drawings and renderings. Hubbard did not have experience with Vectorworks. At the conclusion of this interview, Kelly wanted Hubbard to come back for a second interview. On October 30, 2012, Hubbard returned for a second interview with Kelly and additional Frost employees. During the second interview, Hubbard shared her drawings and renderings with Kelly, Ms. Kelly, and Dennis Remer. After the second interview, Kelly offered Hubbard the position of design assistant. She was not hired to assist Brian McGinley. Hubbard told Kelly that she needed some time to consider it, but she ultimately accepted the offer and began working at Frost, earning an annual salary of $40,000, in

---

[3] According to Kelly, a "Design Assistant" is someone who assists the sales person developing a design for an event. According to Kelly, Fandel was never hired to be a "Design Assistant" and never functioned as one because "she never really had input into what anything looked like. She just took direction from people as to what they wanted a floor plan to look like."

5

mid-November 2009. On November 6, 2009, Frost terminated Fandel's employment because she was unable to do 3D renderings.

On or about January 5, 2010, Fandel filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR"), alleging that she was terminated as a result of her pregnancy. After investigating Fandel's charge against Frost, the IDHR issued a Notice of Dismissal for Lack of Substantial Evidence. Two other employees of Frost—Lisa Kelly and Samantha Steele—became pregnant while working at Frost and both received three months leave.

## II. Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The

non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id*. Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace,* 103 F.3d at 1396.

### III. Analysis

In her complaint, Plaintiff alleges that she was discharged because she became pregnant and asserts four causes of action against Defendant Frost: (1) gender discrimination under Title VII, (2) retaliation under Title VII, (3) discrimination under the Illinois Human Rights Act, and (4) retaliation under the Illinois Human Rights Act. In her response to Defendant's motion for summary judgment, Plaintiff represents that Counts II and IV are superfluous in light of Count I and requests their dismissal.

Frost contends that summary judgment is appropriate on all claims because it decided to replace Fandel before she disclosed her pregnancy to anyone at Frost. As a result, Frost claims

that Fandel cannot show that its decision to replace her was made on the basis of her pregnancy. Fandel maintains that Frost's only reason for firing her was her pregnancy.

### A. Title VII Discrimination Claim

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's * * * sex." 42 U.S.C. § 2000e-2(a). The Pregnancy Discrimination Act ("PDA") brought discrimination based on pregnancy within the protections against sex discrimination. 42 U.S.C. § 2000e(k). The Act provides that pregnant women are to be treated the same for employment-related purposes as other persons. An unlawful employment practice occurs whenever pregnancy is a motivating factor for an adverse employment decision. 42 U.S.C. § 2000e-2(m); see also *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1011 (7th Cir. 1997). The Seventh Circuit has recognized that Title VII "does not protect [a pregnant employee] from being fired without good cause. It protects [her] from being fired because of [her pregnancy]." *Gleason v. Meisrow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997) (bracketed portions in original) (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 657 (7th Cir. 1991) (age discrimination case)). To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and re-explaining that the direct method may be proven with either direct or circumstantial evidence and the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

Under the direct method of proof (also sometimes called "mixed motive" method), the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id.*; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)). "Direct proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion (*e.g.*, 'You're too old to work here.'), but also includes circumstantial evidence which suggests discrimination through a longer chain of inferences." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotations omitted).

The focus of the direct method of proof thus is not whether the evidence offered is "direct" or "circumstantial," but rather whether the evidence "points directly to a discriminatory reason for the employer's action." *Id*. at 671-72. Under the direct method of proof,

> [c]ircumstantial evidence demonstrating intentional discrimination includes: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Sun v. Bd. of Trs. of Univ. of Illinois*, 473 F.3d 799, 812 (7th Cir. 2007)). This last category is substantially

9

the same as the evidence required under the indirect method. See *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003).

Here, it is undisputed that Kelly fired Fandel 11 days after he first learned of her pregnancy. This close temporal proximity points to discrimination. *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) ("[S]uspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link."); see also *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) ("very close" temporal proximity can suffice); *Casna v. Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009); *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (temporal proximity of an adverse action to a protected activity is proof of causation). Although suspicious timing will "rarely be sufficient in and of itself to create a triable issue" (*Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), it may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link. *Lang v. Ill. Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). Suspicious timing is thus "often an important evidentiary ally of the plaintiff." *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001) ("When an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the prima facie case is typically satisfied.").

"Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context, just as an evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). Here, the context is almost as suspicious as the timing. In addition to the suspicious timing, the record

here is devoid of any written or oral complaints that were conveyed to Plaintiff prior to the decision to fire her. See, *e.g.*, *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1283 (7th Cir. 1977) (holding that "the employer's acceptance of [an employee's] work without express reservation is sufficient to show that the plaintiff was performing satisfactorily for the purpose of shifting the burden of proof."). The only evidence of any problem with Plaintiff's performance is one sentence in an e-mail (the authenticity of which has been challenged) from Kelly to Michael Schiml in August 2009: "there are some concerns as to how well she is working out and if we shouldn't be looking for someone with far stronger drafting and rendering skills." Even without considering the authenticity of the e-mail, Kelly's comments are at odds with his subsequent conduct when viewed through the summary judgment prism.

First, in the e-mail Kelly commented that, after only six weeks on the job, Fandel was "improving" and his only critique in the e-mail was regarding her drafting and rendering skills. Furthermore, the record does not support an inference, at this stage, that Fandel was hired to create 3D renderings; she stated during her interview that she did not have those skills and, moreover, prior to announcing her pregnancy she was never asked to create a 3D design. Even more suspect, Hubbard, the woman hired to replace Fandel, was a recent college graduate and waitress who did not have any experience with Vectorworks, which Kelly deemed essential to Fandel's position. See *Evans v. City of Bishop*, 238 F.3d 586, 591 (5th Cir. 2001) (showing of pretext made where employer contended that plaintiff was rejected because of certain qualifications which ultimately were not a priority). Moreover, Hubbard, who Frost contends replaced Fandel, was not interviewed or offered a job until after Kelly learned Fandel was pregnant. And Hubbard was hired as a "design assistant," a job much different than the one Fandel performed. Yen, who Frost maintains it also considered for Fandel's position, arguably

was not qualified for Fandel's position (she, like Hubbard, did not have experience with Vectorworks) and furthermore did not even believe that she was being interviewed, let alone for Fandel's position.

Additionally, the August 2009 e-mail details how Frost hired Schiml to evaluate personnel and identify appropriate changes. Despite the one concern about Fandel included in the e-mail, the record does not contain any evidence that Schiml's observations over the first two months supported firing Fandel. Furthermore, Schiml was excluded from the first personnel decision (Fandel's firing) following his hiring. Frost's purported reason for firing Plaintiff—to get someone with "far stronger drafting" skills—netted a waitress with no relevant job experience and no experience with the drafting program used by Frost. Even if the e-mail is authentic, Kelly's critique of Fandel remains inconsistent with his subsequent conduct. See *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."); see also *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 423 (1st Cir. 2000) (stating that when a company, at different times, gives different explanations, a jury may infer that the articulated reasons are pretextual). Considering the record produced at summary judgment, a valid inference from these facts is that Frost's story is a pretext to conceal their real reason for firing Fandel, *i.e.*, she told them she was pregnant

Kelly's reaction to Fandel's pregnancy announcement also points to a discriminatory animus behind her termination. On the morning of October 26, 2009, Fandel told David and Lisa Kelly that she was pregnant. Lisa Kelly congratulated Fandel and said "let us know if there is anything we can do" and "we will talk later about family medical leave." Lisa's comments suggest that Frost would continue to employ Fandel and contradict David Kelly's testimony that

Lisa knew at that time that Fandel was going to be fired by virtue of her participation in the September 2009 "key staff" meeting. Lisa's reaction raises doubts not only about whether she knew Fandel was going to be fired, but also calls into question whether a "key staff meeting" was held. Notably, Defendant's support for the existence of the meeting and the conclusion reached—that "everyone * * * present at the meeting agreed" that Fandel should be replaced—comes only from Kelly's testimony, not from any other alleged participants at the meeting. Furthermore, when Fandel announced her pregnancy, Kelly did not congratulate her; instead, after Lisa mentioned family medical leave, Kelly acted annoyed and questioned Fandel if she would be taking medical leave and for how long. Viewed in the light most favorable to Fandel, Kelly's reaction not only creates the inference that was he unhappy with the news, but also conflicts with his assertion that he had decided to fire Fandel long before learning of Fandel's pregnancy. If Kelly were planning to fire Fandel, he would not have needed to ask questions related to leave time. Kelly's reaction raises a reasonable inference that Fandel's pregnancy and the corresponding time that she would take off were motivating factors for her termination.[4]

The foregoing evidence (or, in certain instances, the lack thereof)—suspicious timing, shifting explanations, the Kelly's reactions to the pregnancy announcement, the qualifications of

---

[4] Defendant's only responsive argument to Plaintiff's point about the varying reactions from the Kellys is that it denies that Lisa Kelly mentioned medical leave or that David Kelly looked annoyed and questioned Plaintiff about the length of time Plaintiff would be out. Defendant's denial merely creates a disputed issue of fact; it does not resolve the issue. In its reply brief, Defendant repeatedly ignores a basic tenant of summary judgment: in determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). Defendant also ignores the well-known rule that, in ruling on summary judgment motions, courts consider the types of materials listed in Rule 56(c) and evidence that would be admissible if offered at trial. Fed. R. Civ. P. 56(e)(1); see also *Celotex Corp. v. Catrett,* 477 U.S. at 324; *Modrowski v. Pigatto,* 712 F.3d 1166 (7th Cir. 2013); *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 371 n. 6 (7th Cir. 1997) (declining to consider hearsay evidence in ruling on a motion for summary judgment); *Colan v. Cutler–Hammer, Inc.,* 812 F.2d 357, 365 n. 14 (7th Cir. 1987) (refusing to consider inadmissible handwritten notes which were incomplete, unreliable, and riddled with hearsay in rendering a decision on a motion for summary judgment); *Knox v. Weltman, Weinberg & Reis Co., L.P.A.*, 2013 WL 3338311, at*2 (N.D. Ind. 2013). In contravention of this rule, Defendant repeatedly relies on hearsay to support its arguments.

Fandel's "replacement," the lack of evidence that a "key staff meeting" ever took place, the lack of any written or oral complaints to Fandel regarding her performance during her tenure at Frost, and the general manager's exclusion from the hiring decision—creates a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. The record simply does not support Frost's assertion—based solely on evidence generated from Kelly—that Fandel was fired due to performance problems.

> B. **The Illinois Human Rights Act**

Defendant's one-paragraph argument for dismissal of Counts III and IV relies on the arguments made with respect to Plaintiff's Title VII claim and simply asserts that "Frost Lighting's decision to replace Ms. Fandel was made before anyone at Frost Lighting even knew that Ms. Fandel was pregnant and, therefore, Ms. Fandel was not discharged on the basis of her pregnancy." For the reasons previously stated, this argument fails. However, Plaintiff has asked the Court to dismiss Count IV (and Count II, as previously indicated) as superfluous of Count I. Therefore, while the Court denies Defendant's motion for summary judgment, it dismisses Counts II and IV as superfluous in light of Count I. Counts I and III will remain pending.

> C. **The Authenticity of the August 30, 2009 E-mail**

For the reasons stated above, the Court has concluded that, even considered the August 30, 2009 e-mail as evidence in support of Defendant's motion for summary judgment, Plaintiff has created a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. Thus, consideration of the circumstances surrounding Frost's "strange" and dilatory production of the August 2009 e-mail is not necessary to the resolution of the issues presented by Defendant's summary judgment motion. However, the authenticity of the August 30, 2009 e-mail will be revisited by the Court in preparing for trial. In the event that the Court

determines that the e-mail is not authentic, but rather was created for the purpose of litigation, the Court will determine the appropriate sanction at that time. In the event the e-mail is found to be authentic, Defendant may use the e-mail as evidence at trial.

**IV.     Conclusion**

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment [75]. Because Plaintiff has deemed Counts II and IV to be superfluous in light of Count I, the Court dismisses Counts II and IV. Counts I and III remain pending.

Dated:  July 25, 2013

_____
Robert M. Dow, Jr.
United States District Judge